# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
### No. 17-1530V
### UNPUBLISHED

| | |
|---|---|
| RYAN M. SCHMIDT,<br><br>              Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>              Respondent. | Chief Special Master Corcoran<br><br>Filed: October 7, 2021<br><br>Special Processing Unit (SPU);<br>Findings of Fact; Site of Vaccination<br>Influenza (Flu) Vaccine; Shoulder<br>Injury Related to Vaccine<br>Administration (SIRVA) |

*David J. Ward*, Michel & Ward PC, Chattanooga, TN, for Petitioner.

*Claudia Barnes Gangi*, U.S. Department of Justice, Washington, DC, for Respondent.

## FINDINGS OF FACT[1]

On October 16, 2017, Ryan Schmidt filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that he suffered "injuries, including bursitis with left shoulder impingement, frayed and torn labrum, inflamed bursa, rotator cuff inflammation, extensive changes in the supraspinatus, and infraspinatus tear" resulting from the adverse effects of an influenza ("flu") vaccine received on October 18, 2014.[3] Petition at

---

[1] Because this unpublished Fact Ruling contains a reasoned explanation for the action in this case, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the Fact Ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

[3] Petitioner subsequently filed an amended petition clarifying that he is alleging an on-Table injury and, in the alternative, causation-in-fact. ECF 17.

1. The case was assigned to the Special Processing Unit of the Office of Special Masters (the "SPU").

The ruling herein resolves certain fact dispute between the parties bearing on Petitioner's entitlement claim. Based on my determinations below, it appears Petitioner's claim may not be well-founded, and therefore Petitioner must seriously consider its voluntary dismissal.

### I.     Relevant Procedural History

During an initial status conference, it was noted that while Petitioner is alleging a left shoulder injury, the records contemporaneous to the date of vaccine reflect that the flu vaccination was administered in his *right* arm. ECF 12. Petitioner was thereafter ordered to file any additional evidence he wished to have considered regarding the injection site of his alleged injury-causing vaccination, as well as an amended petition, if desired. *Id*. Mr. Schmidt subsequently filed an amended petition, in which he alleged both a Table injury and a causation-in-fact claim. ECF 17. On July 27, 2018, Respondent filed a status report indicating that he intended to oppose compensation and requesting a deadline for his Rule 4(c) Report. ECF 26.

On September 25, 2018, Respondent filed his Rule 4(c) Report, asserting therein that there is not a preponderance of evidence demonstrating that the flu vaccine was administered in Petitioner's left shoulder. ECF 28. Another status conference was held on October 16, 2018, after which Petitioner filed a supplemental affidavit, additional medical records, and a timesheet from his employer. ECF 30; ECF 33-35.

After reviewing the newly-submitted records, Respondent filed another status report stating that he "maintains his position . . . that this case should be dismissed in the absence of further evidence that the vaccination at issue was administered in [P]etitioner's left arm." ECF 37. Petitioner was then ordered to file the MRI images of his left shoulder, and Respondent filed a motion for leave to file an expert report interpreting these images. ECF 38; ECF 39.

On May 16, 2019, former Chief Special Master Dorsey[4] held a status conference with the parties to discuss Respondent's motion, which she then granted. ECF 41. Respondent filed an expert report from Dr. Geoffrey Abrams on June 28, 2019. ECF 44.

---

[4] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell. For the next four years, until September 30, 2019, all SPU cases, including the majority of SIRVA claims, were assigned to former Chief Special Master Dorsey, now Special Master Dorsey. In early October 2019, the majority of SPU cases were reassigned to me as the current Chief Special Master.

Petitioner was provided the opportunity to file a responsive report, but later represented that he planned to rely solely on the previously-submitted affidavit of Dr. David Bruce, his treating orthopedist. ECF 45.

After I became Chief Special Master (and thus responsible for SPU cases), I held a status conference to discuss the parties' current positions, and then ordered Petitioner to file a status report indicating his preference for resolving the issue of site of vaccination through briefing or a fact hearing. Petitioner filed a status report requesting resolution through briefing, and both parties have briefed this issue. ECF 49; ECF 50; ECF 52. Therefore, this matter is now ripe for adjudication.

## II.     Issue

At issue is whether Petitioner received the vaccination alleged as causal in his left arm. 42 C.F. R. § 100.3(a)(XIV)(B) (2017).

## III.    Authority

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Vaccine Act Section 11(c)(1). A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence.  The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Human Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, this rule does not always apply. In *Lowrie*, the special master wrote that "written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Lowrie*, at *19. Further the Federal Circuit recently "reject[ed] as incorrect the *presumption* that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Human Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021) (emphasis added).

The United States Court of Federal Claims has recognized that "medical records may be incomplete or inaccurate." *Camery v. Sec'y of Health & Human Servs.*, 42 Fed. Cl. 381, 391 (1998). The Court later outlined four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Human Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014).

The Court has also said that medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery*, 42 Fed. Cl. at 391 (citing *Blutstein v. Sec'y of Health & Human Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering such testimony must also be determined. *Andreu v. Sec'y of Health & Human Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Human Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe*, 110 Fed. Cl. at 204 (citing Section 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Human Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational); *Doe/70 v. Sec'y of Health & Human Servs.*, 95 Fed. Cl. 598, 608 (2010) ("[g]iven the inconsistencies between petitioner's testimony and his contemporaneous medical records, the special master's decision to rely on petitioner's medical records was rational and consistent with applicable law"), *aff'd*, *Rickett v. Sec'y of Health & Human Servs.*, 468 F. App'x 952 (Fed. Cir. 2011).

In reaching a decision in this case, I have considered other decisions issued by special masters involving similar injuries, vaccines, or circumstances. I also reference some of those cases in this decision, in an effort to establish common themes, as well as to demonstrate how prior determinations impact my thinking on the present case. There is no error in doing so. It is certainly correct that prior decisions in different cases do not *control* the outcome herein, as each case presents different medical histories, experts,

4

and treatment, and could therefore reasonably result in contrary determinations.[5] *See Boatmon v. Sec'y of Health & Human Servs.*, 941 F.3d 1351, 1358–59 (Fed. Cir. 2019); *Hanlon v. Sec'y of Health & Human Servs.*, 40 Fed. Cl. 625, 630 (1998).

However, it is *equally* the case that special masters may reasonably draw upon their experience in resolving Vaccine Act claims. *Doe v. Sec'y of Health & Human Servs.*, 76 Fed. Cl. 328, 338–39 (2007) ("[o]ne reason that proceedings are more expeditious in the hands of special masters is that the special masters have the *expertise and experience to know the type of information that is most probative of a claim*") (emphasis added). I would thus be remiss in ignoring prior cases presenting similar theories or factual circumstances, along with the reasoning employed in reaching such decisions. Even if the Federal Circuit does not *require* special masters to distinguish other relevant cases (*Boatmon*, 941 F.3d at 1358), it is still wise to do so.

### IV.   Factual History as Set Forth in Medical Records

At approximately 5:30 pm on October 18, 2016, Petitioner, a production manager at the Volkswagen Chattanooga Assembly Plant in Chattanooga, Tennessee, received the flu vaccine at the Volkswagen Onsite Medical Clinic ("VOMC"). Ex 1 at 3. There are two records documenting the administration of the vaccine. The first, from Petitioner's VOMC electronic medical record, reflects that (1) the "injection [was] given to [the] right deltoid," (2) Petitioner signed the vaccine consent form, and (3) Petitioner "tolerated [vaccination] well and denies any needs at completio[n] of visit." *Id.* The second record is a handwritten "Seasonal Influenza Immunization Consent Form" reflecting the injection site as "RA":



---

[5] By contrast, Federal Circuit rulings concerning legal issues are binding on special masters. *Guillory v. Sec'y of Health & Human Servs.*, 59 Fed. Cl. 121, 124 (2003), aff'd 104 F. Appx. 712 (Fed. Cir. 2004); *see also Spooner v. Sec'y of Health & Human Servs.*, No. 13-159V, 2014 WL 504728, at *7 n.12 (Fed. Cl. Spec. Mstr. Jan. 16, 2014).

*Id*. at 12.

Approximately 24 hours later, Petitioner returned to VOMC with complaints of *left* arm pain "after receiving a flu shot yesterday evening." Ex 1 at 3. The examining physician, Dr. David Darden, noted that Petitioner "[c]almly complains of intense pain and cannot raise arm above a certain level as he demonstrate[s] the level by raising his arm to above the waist." *Id*. Physical examination of the left shoulder showed no redness or swelling, and Dr. Darden could not visualize any injection site. *Id*. at 3, 15. Petitioner's left deltoid muscle was "soft," and he displayed a "very strong grip." *Id*. at 3. Neurologic examination was normal, and no limitations were noted on passive range of motion of the left shoulder. *Id*. Petitioner was assessed with "subjective complaint of left arm pain and inability to lift arm with no objective findings." *Id*. Dr. Darden informed Petitioner that he could work at "full duty" and explained that "there was no physiological or anatomic reason [Petitioner] could not lift his arm." *Id*. Despite this, Petitioner requested a work excuse, and he was noted to be upset when one was not granted.[6] *Id*.

Later that same evening, Mr. Schmidt presented to the emergency room (ER) with a complaint of "complications from flu shot" in his left shoulder starting at approximately 2:00 am on October 19, 2016. Ex 8 at 3. Physical examination revealed decreased range of motion of the left upper extremity but normal sensation and motor strength. *Id*. at 8. While Petitioner was diagnosed with "post injection arm pain," the ER physician noted he was "unsure why [Petitioner] is having pain," but that he would treat Petitioner's symptoms with pain medication and a sling. *Id*. at 7, 9.

One month later, on November 14, 2016, Petitioner presented to Chattanooga Bone and Joint Surgeons (CBJS) for evaluation of left shoulder pain. Ex 2 at 12. He reported left shoulder pain and weakness that began on October 9, 2016[7] after receiving a flu shot. Examination by Mark Cloutier, a nurse practitioner, revealed no abnormality of the left shoulder and no erythema or ecchymosis of the skin. *Id*. During range of motion exercises, Mr. Schmidt began "to have a lot of pain and apprehension at 90 degrees of forward flexion and abduction." *Id*. He displayed 4/5 abduction strength and 3/5 external rotation strength but no motor or sensory deficits. *Id*. NP Cloutier referred Petitioner for an MRI, which demonstrated evidence of (1) supraspinatus and infraspinatus tendinosis without significant tear, (2) intra-articular bicipital tendinosis with extra-articular tenosynovitis, (3) posterior labral superficial and intrasubstance degenerative changes

---

[6] While Petitioner was not granted a work excuse, he apparently chose to take leave that day, as his employment records reflect an "excused absence unpaid" on October 19, 2016 and "paid time off" on October 20, 2016. ECF 34, Attachment 1.

[7] Petitioner received his flu shot on October 18, 2016. Ex 1 at 3, 12.

with a small focal linear tear, but no detached or displaced labral tear, and (4) no significant subacromial subdeltoid bursal fluid. *Id*. at 20.

Mr. Schmidt returned with his MRI results to CBJS the next day, at which time NP Cloutier diagnosed him with rotator cuff tendinitis and referred him to physical therapy.[8] Ex 2 at 12. At a follow-up visit on December 12, 2016, Petitioner displayed left upper extremity forward elevation to 170 degrees and active abduction to 90 degrees. *Id*. at 10. NP Cloutier also noted that Petitioner had "pain with rotator cuff strength testing, but his strength is still there." *Id*. Petitioner was thereafter administered a cortisone injection in his left shoulder. *Id*.

On January 16, 2017, Petitioner returned to CBJS and was evaluated by Dr. David Bruce, an orthopedic surgeon, at which time Petitioner underwent a second cortisone injection. Ex. 2 at 8. Dr. Bruce also administered two more cortisone injections to the left shoulder on February 17 and March 31, 2017.[9] *Id*. at 4, 6. Several months later, on June 7, 2017, Dr. Bruce performed a left shoulder arthroscopy with arthroscopic bursectomy, debridement, and subacromial decompression. *Id*. at 1. The operative report includes findings of anterior labral fraying, intact biceps anchor, inflammatory changes of the supraspinatus but no tearing or other changes in the intra-articular space, and inflammatory changes but no evidence of tearing of the rotator cuff. *Id*. at 1-2. No additional medical records have been submitted.

V. **Expert and Treater Opinions**

a. **Dr. David Bruce**

As noted above, Petitioner was provided the opportunity to file an expert report, but instead chose to rely on an affidavit from Dr. Bruce, his treating orthopedic surgeon. ECF 45. In that affidavit, dated January 10, 2019, Dr. Bruce averred that he is board certified by the American Academy of Orthopaedic Surgeons with a fellowship in

---

[8] While not determinative regarding the site of vaccination, the record also reflects that Petitioner attended 19 sessions of physical therapy to treat left shoulder pain from November 18, 2016 to September 15, 2017. Ex 4 at 5.

[9] Although the specific locations of the first and third steroid injections in the left shoulder are not noted in the record, Dr. Bruce's notes reflect that the second injection, on January 16, 2017, was administered "in the subacromial space in the joint" and the fourth, on March 31, 2017 was injected into the "bursal and glenohumeral" area. Ex 2 at 4, 8.

shoulder/sports medicine. Ex 6 at ¶ 3. He has been a practicing orthopedic surgeon for over 20 years,[10] and he treated Petitioner for approximately five months. *Id*. at ¶¶ 3, 13.[11]

In his affidavit, Dr. Bruce notes that after reviewing the x-ray films "from Erlanger at Volkswagen"[12] and the November 2016 MRI, he was able to visualize the "track made by the needle which delivered the influenza vaccine in [Petitioner's] left arm" and that this finding "correlated exactly with where [Petitioner] reported the vaccine needle had been placed." Ex 6 at ¶ 13. During his first appointment with Petitioner, Dr. Bruce informed Petitioner that "his left arm was acting just like every other misplaced flu shot injection that [he] had ever seen, of which [he] ha[d] seen and treated several."[13] *Id*. at ¶¶ 14-15.

Dr. Bruce further avers that "the injection site in [Petitioner's] left arm could be visualized [on the MRI] directly into the rotator cuff," and the "appearance of the tear caused by the needle c[an] best be seen on . . . Slice 5 of the . . . MRI." Ex 6 at ¶¶ 13, 16. In an attachment to his affidavit, Dr. Bruce drew a line marking the "site of the tear" on Slide 18 of the MRI. *See* ECF 33. He also asserts that the imaging "revealed that the misplacement of the needle and subsequent injection of the vaccine into the wrong area of [Petitioner's] left arm caused significant inflammation of his infraspinatus and supraspinatus," resulting in Petitioner's "external and rotation and abduction weakness and pain." Ex 6 at ¶ 13.

Dr. Bruce also maintains that during Petitioner's surgery, he "located the track of the needle in [Petitioner's] left arm" and "could see where the bursa had . . . been injected." Ex 6 at ¶¶ 24, 30a. His observations during surgery led him to conclude that the "irritation and inflammation [of Petitioner's rotator cuff] appeared to be as a result of the acromial injection of the influenza vaccine." *Id*. at ¶ 28. And his operative report indicates that "[t]his does appear to be acromial injection of the flu shot material[14] based on the clinical evidence from the patient and the evidence from the scope." Ex 2 at 2.

---

[10] In his brief, Petitioner asserts that Dr. Bruce "has been in practice for more than 28 years and has had significant experience treating people who have encountered SIRVA injuries;" but Petitioner did not file Dr. Bruce's CV or other evidence confirming this information. ECF 50 at 13.

[11] While Petitioner began treating at CBJS (Dr. Bruce's practice) in November 2016, he was evaluated and treated by NP Cloutier at his first three visits. Ex 2 at 8-14. Petitioner had his first visit with Dr. Bruce on January 16, 2017. *Id*. at 7.

[12] There is no mention of x-rays in the records from VOMC, and Petitioner has not submitted an x-ray report from this provider. *See* Ex 1.

[13] Dr. Bruce has not provided any specificity as to how many vaccine-related shoulder injuries he has treated. *See* Ex 6 at ¶¶ 14-15.

[14] The operative report is unclear as to what finding Dr. Bruce is referring to with the use of "this" or where specifically the "flu shot material" was observed. Ex 2 at 1-2.

Based upon his review of the records and his treatment of Petitioner, Dr. Bruce reached the following conclusions "within a reasonable degree of medical certainty:" (1) the influenza vaccine was more likely than not given in Petitioner's left, rather than right, arm, and (2) the "misplaced" vaccination more likely than not caused Petitioner to suffer inflammation in his supraspinatus, infraspinatus, rotator cuff, and subacromial space. Ex 6 at ¶ 30a-b.

### b. Dr. Geoffrey Abrams

Dr. Abrams acted as Respondent's expert and filed a report with accompanying literature on June 25, 2019. Exs A-B. Dr. Abrams is a Board Certified Orthopedic Surgeon with a subspeciality in Sports Medicine. Ex A at 1; Ex C at 2. His report concludes the flu vaccine in question was more likely administered in Petitioner's right arm.

Dr. Abrams's surgical practice focuses on orthopedic conditions of the shoulder, and he has published extensively on shoulder pathology. Ex A at 1; Ex C at 2-9.[15] At the time of his report, he served as Assistant Professor of Orthopedic Surgery at Stanford University School of Medicine; held the appointments of Staff Physician at the VA Palo Alto Health Care Division, Director of Sports Medicine for Stanford University Varsity Athletics, and Director of the Lacob Family Sports Medicine Center at Stanford University; and served as team physician for numerous professional and collegiate sports teams in the San Francisco Bay Area. *Id*.

In preparing his report, Dr. Abrams reviewed Petitioner's Exhibits 1-8. Ex A at 1-4. He begins by addressing Dr. Bruce's claim that he could "visualize" evidence of the injection on Petitioner's MRI, specifically the alleged "needle track" on Slides 5 and 18. In contrast with Dr. Bruce, Dr. Abrams states that his review of both MRI slides highlighted by Dr. Brace and the original MRI images do *not* demonstrate a needle track. Ex A at 4. In fact, Dr. Abrams argues that "to be able to see a needle trac[k] on an MRI nearly one month after the supposed injection is extremely unlikely." *Id*. Instead, "similar to a scar or scratch on one's skin, the soft tissues around any track (or hole) . . . made by a needle would 'heal' or 'scar in' and [would] no longer be visible shortly after the injection." *Id*.

Dr. Abrams further asserts that Dr. Bruce's conclusions are undermined by the fact that there was no visible evidence of soft tissue inflammation within the subcutaneous tissue or deltoid musculature on Petitioner's MRI to indicate an injection near the area where the vaccine was allegedly administered. Ex A at 5. In making this argument, Dr. Abrams referred to a case report addressing shoulder pain following influenza

---

[15] Dr. Abrams' CV reflects 73 peer reviewed publications, as well as "podium presentations" at conferences and meetings of the American Academy of Orthopedic Surgeons and American Shoulder and Elbow Surgeons, among others. Ex C at 2-10. He is also the author of multiple book chapters on the shoulder and serves as a reviewer of the Journal of Bone and Joint Surgery, the Journal of the American Academy of Orthopedic Surgeons, and the Journal of Shoulder and Elbow Surgery. *Id*. at 19-21, 23.

vaccination, which he filed with his expert report. G. Okur et. al., *Magnetic Resonance Imaging of Abnormal Shoulder Pain Following Influenza Vaccination*, 43 Skeletal Radiol. 1325-31 (2014), filed as Ex B ("Okur"). Okur examined MRIs of patients with suspected SIRVA, and reported that the most common finding was "intrasubstance fluid-like signal in deep muscular and/or tendinous structures." *Id*. at 1329. Focal bone marrow signal within the humeral head and inflammatory changes in the subacromial/subdeltoid bursa were also observed. *Id*. Dr. Abrams asserts that "[n]one of these findings were present on [P]etitioner's shoulder MRI," which did not show excess fluid within the subacromial space or bursa to indicate inflammation, "a supposed cause (due to vaccine administration) of [P]etitioner's shoulder pain according to Dr. Bruce." Ex A at 5.

Dr. Abrams also addresses Dr. Bruce's assertion in his operative report that he could identify "where the [bursa] had actually been injected." Ex A at 5 (citing Ex 2 at 1-2). However, by the time Petitioner underwent surgery, he had received multiple[16] steroid injections in his left shoulder, and Dr. Abrams argues that "it is nearly certain that these . . . injections, all within quick succession, were responsible for any 'inflamed and injected' bursa rather than any purported single vaccine injection eight months prior to surgery." Ex A at 5. In fact, Dr. Abrams asserts that Dr. Bruce's claims regarding the "MRI and intra-operative evidence of needle tracks, tearing, and inflammation from a supposed vaccine injection do not hold up to medical scrutiny." *Id*. Based on his review of the entirety of the record, Dr. Abrams concludes that "this case does not meet the requirements for a SIRVA diagnosis as there is no evidence to support the claim that [P]etitioner received the injection into his left shoulder." *Id*.

## VI. Analysis

### a. Fact Evidence

Petitioners in other Vaccine Program cases have successfully established a fact through their own testimony, though usually in instances where the records are silent or do not directly contradict the fact at issue. *See, e.g., Syed v. Sec'y of Health & Human Servs.*, No. 19-1364V, 2021 WL 2229829, at *4-5 (Fed. Cl. Spec. Mstr. Apr. 28, 2021) (finding that the vaccine was administered in the alleged arm in part because the VAR from the computerized system was incomplete); *Hanna v. Sec'y of Health & Human Servs.*, No. 18-1455V, 2021 WL 3486248, at *1, 8-10 (Fed. Cl. Spec. Mstr. July 15, 2021) (giving more weight to subsequent treatment records when the preprinted form prompting

---

[16] Dr. Abrams indicates that Petitioner had three prior steroid injections, in December 2016 and in January and February 2017. Ex A at 5. However, the record reflects that Petitioner had a fourth steroid injection in March 2017. Ex 2 at 4.

10

identification of the injection site was left blank, while an "ambiguous" handwritten notation of "L" appeared elsewhere in the document).

However, when the contemporaneous medical records are in direct conflict with a petitioner's testimony, the medical records are usually considered to be more reliable and are afforded more weight (even if the Federal Circuit now instructs that records are not *presumptively* correct). *See, e.g., Rich v. Sec'y of Health & Human Servs.*, No. 12-742V, 2015 WL 5882324, at *11 (Fed. Cl. Spec. Mstr. Sept. 16, 2015) (finding petitioner's testimony alleging an earlier onset of symptoms less persuasive than the contemporaneous medical records that did not reference any of the alleged symptoms at that time); *Robi v. Sec'y of Health & Human Servs.*, No. 12-352V, 2014 WL 1677116, at *5 (Fed. Cl. Spec. Mstr. Apr. 4, 2014) (petitioners gave compelling testimony regarding the onset of their child's symptoms, but the medical records were nonetheless found to be more persuasive in determining the date the symptoms began); *Bradley*, 991 F.2d at 1573, 1575 (although the special master believed that Petitioner was telling the truth as she remembered events, her recollections were not credible and persuasive because the record lacked corroborating medical evidence); *Keaton v. Sec'y of Health & Human Servs.*, No. 12-444V, 2014 WL 3696349, at *8 (Fed. Cl. Spec. Mstr. July 2, 2014) (dismissing claim where contrary to the petitioner's recollection, the medical records strongly suggested that no vaccine was given).[17]

Here, Mr. Schmidt has not presented sufficient evidence to conclude that the contemporaneous vaccination records are incomplete or inconsistent. Both the VOMC electronic medical record and the handwritten log reflect the right arm as site of vaccination. These records are also consistent with evidence documenting that Petitioner received the flu vaccine in his *right* arm in prior years. Ex 1 at 4, 6. And the vaccination record suggests Petitioner signed off on its contents as well. Ex. 1 at 3. Such records are clear, consistent, and complete, and therefore are deserving of substantial weight. *See Lowrie*, 2005 WL 6117475, at *20.

Petitioner, by contrast, has not presented preponderant evidence to support his counter-argument that the vaccine was actually administered in his left arm. Mr. Schmidt claims he has a "clear and specific recollection that [he] received [the flu vaccine] in his

---

[17] In another case involving the issue of situs, I credited a petitioner's testimony over the contemporaneous records. *Gallo v. Sec'y of Health & Human Servs.*, No. 18-1298V, 2019 WL 7496617, at *5 (Fed. Cl. Spec. Mstr. Dec. 5, 2019). The *Gallo* petitioner, however, provided a detailed explanation to support his recollection -- that he had suffered an adverse reaction to the same vaccine as a child, and had as a result requested that the vaccine be administered in his non-dominant arm. I deemed it to present a "close call," meaning it should be resolved in the claimant's favor. *Gallo*, 2019 WL 7496617, at *5. Here, by contrast, the vaccine records are in direct conflict with Petitioner's affidavit testimony, and no additional corroborative proof exists to confirm Petitioner's recollection.

11

left shoulder," because he is right-hand dominant, and thus generally requests that "injections be given in [his] non-dominant left shoulder so that any resulting soreness does not affect [his] ability to perform [his] duties at work and activities of daily living." Ex 5 at ¶¶ 5-6. But this assertion is in direct contradiction with the evidence showing Petitioner received flu vaccines in two prior 2014 and 2015 that were *also* both administered in the right shoulder.[18] Ex 1 at 4, 6. These injections were given at the same worksite clinic where Petitioner received his 2016 injection. *Id*. It seems reasonable that Petitioner would have had similar concerns in 2014 and 2015 regarding his ability to maintain his work duties and partake in activities of daily living, yet he still elected to receive the vaccine in his right shoulder both years. Furthermore, Petitioner was provided with the opportunity to explain why he may have gotten the flu shot on the left in 2016 despite receiving it on the right in 2014 and 2015, yet he failed to do so. ECF 29 at 1-2.

In other cases, petitioners have provided sufficient evidence outside of their own testimony to rebut the site of administration listed in the vaccine record. *See, e.g., Rodgers v. Sec'y of Health & Human Servs.,* No. 18-0559V, 2020 WL 1870268 (Fed. Cl. Spec. Mstr. Mar. 11, 2020); *Mogavero v. Sec'y of Health & Human Servs.*, No. 18-1197V, 2020 WL 4198762 (Fed. Cl. Spec. Mstr. May 12, 2020); *Gallo v. Sec'y of Health & Human Servs.,* No. 18-1298V, 2019 WL 7496617, at *5 (Fed. Cl. Spec. Mstr. Dec. 5, 2019). But such cases have often involved computerized vaccine records that require little thought or effort on the part of the vaccine administrator when identifying the site of vaccination, such as a "drop down" box. *See, e.g., Rodgers*, 2020 WL 1870268, at *5; *Desai v. Sec'y of Health & Human Servs.*, No. 14-0811V, 2020 WL 4919777, at *14 (Fed. Cl. Spec. Mstr. July 30, 2020); *Mezzacapo v. Sec'y of Health & Human Servs.*, No. 18-1977V, 2021 WL 1940435, at *4, 6 (Fed. Cl. Spec. Mstr. Apr. 19, 2021).

More reliable are situs records that requires specific action on the part of the vaccine administrator, performed close in time to administration. For example, in *Marion*,[19] under the section listing the site of administration on the consent form, the vaccine administrator manually circled the option for "LA" rather than "RA." *Marion*, 2020 WL 7054414, at *8. This notation was consistent with the computerized record. *Id*. Given that the vaccine administrator there was required to manually circle the notation on the consent form, I found this entry provided substantial evidence corroborating the conclusion that the vaccine alleged as causal was administered in the non-injured arm.

---

[18] In fact, the record for Petitioner's October 2014 flu vaccine reflects that it was administered "in [right] deltoid per [Petitioner's] request." Ex 2 at 6.

[19] *Marion v. Sec'y of Health & Human Servs.*, No. 19-0495V, 2020 WL 7054414 (Fed. Cl. Spec. Mstr. Oct. 27, 2020).

*Id*. I further concluded that the subsequent records were insufficient to overcome the clear evidence provided in the contemporaneously created vaccine record. *Id*. at *9.

The contemporaneous documentation regarding situs in the present case is even more persuasive. As in *Marion*, there are two separate but consistent documents in the medical record identifying the location of vaccination. Further, the vaccine log was completed by hand rather than as part of a prepopulated electronic form. It was signed by both the vaccine administrator and Petitioner and is consistent with the notes in Petitioner's VOMC electronic medical record. The vaccine log also contains signatures from multiple vaccine administrators, suggesting that the site of injection is not recorded in advance and requiring thought on the part of the administrator. Absent evidence suggesting that the *vaccine administration record itself* is unreliable, it remains the most contemporaneous record of the vaccine injection site and warrants significant weight.

The record also includes numerous other inconsistencies that raise questions regarding the credibility of Petitioner's testimony. For example, in both his affidavit and at his November 14, 2016 visit with NP Cloutier, Petitioner reported that he "could not finish his shift at work on [the day of vaccination]." Ex 2 at 14; Ex 3 at ¶ 5. However, Petitioner's leave records reflect an "excused absence unpaid" on October 19, 2016, the day *after* vaccination.[20] ECF 34. At the same visit with NP Cloutier, Petitioner also stated that he "had severe pain with injection" – even though records from VOMC reflect that Petitioner "tolerated [the vaccination] well and denie[d] any needs at completio[n] of visit." Ex 1 at 3; Ex 2 at 14. Further, at the ER, rather than reporting pain immediately after vaccination, Petitioner stated that his pain began at approximately 2:00 am on October 19, 2016. Ex 8 at 3. And at his October 19, 2016 visit to VOMC, Petitioner stated that he required his wife's assistance in getting dressed, yet he was able to drive himself to and from the emergency room (with no reported issues) later that same day. Ex 1 at 4; Ex 8. In fact, despite Petitioner's allegations that he was experiencing severe pain that was interfering with his activities of daily living and his sleep, Petitioner did not seek out any treatment for his shoulder for one month after his discharge from the ER, despite being provided with a referral to a primary care physician at that time. Ex 8 at 4.

Other allegations in the relevant pleadings also promote skepticism as to the Petitioner's assertions. For example, Mr. Schmidt's brief contends that "by presenting at [VOMC], and representing that the [vaccination] was received in his left arm, [he] would be placing his very employment in jeopardy if that assertion were not true." ECF 50 at 17. However, Petitioner has never reported any type of adverse workplace action based on his reports of left arm pain - despite the records showing that the flu vaccine was

---

[20] As discussed above, Petitioner did visit VOMC at approximately 5:00 pm on October 19, 2016, at which time he "calmly complain[ed] of intense pain" and requested a work excuse for the day. Ex 1 at 3.

13

administered in the right shoulder. Petitioner further states that in returning to VOMC less than 24 hours after vaccination with complaints of left shoulder pain, "if he indeed knew that the injection was given in his right shoulder" he would have to assume that the clinic did not record the site of injection "or that the medical provider would not look back at the records to make that determination" and that "[n]either is a reasonable assumption on the part of Petitioner or any other person." ECF 50 at 17. However, this *post hoc ergo propter hoc* argument is insufficient to overcome the consistent, contemporaneous vaccination administration records.

### b. Treating Physician Statements and Expert Testimony

Weighing the relative persuasiveness of competing expert testimony, based on a particular expert's credibility, is part of the overall reliability analysis to which special masters must subject expert testimony in Vaccine Program cases. *Moberly v. Sec'y of Health & Human Servs.*, 592 F.3d 1315, 1325–26 (Fed. Cir. 2010) ("[a]ssessments as to the reliability of expert testimony often turn on credibility determinations"); see also *Porter v. Sec'y of Health & Human Servs.*, 663 F.3d 1242, 1250 (Fed. Cir. 2011) ("this court has unambiguously explained that special masters are expected to consider the credibility of expert witnesses in evaluating petitions for compensation under the Vaccine Act").

Although statements from treating physicians are generally favored, such evidence is not sacrosanct, can be rebutted, and can be found as unreliable or not dispositive by a special master based on the entirety of the record. *See* 42 U.S.C. § 300aa-13(b)(1) (statements of treating physicians are not binding on special masters); *Snyder v. Sec'y of Health & Human Servs.*, 88 Fed. Cl. 706, 746 n.67 (2009) ("there is nothing . . . that mandates that the testimony of a treating physician is sacrosanct—that it must be accepted in its entirety and cannot be rebutted)"; *Davis v. Sec'y of Health & Human Servs.*, No. 07-451V, 2010 WL 1444056, at *14 (Fed. Cl. Spec. Mstr. Mar. 10, 2010), *aff'd*, 94 Fed. Cl. 53 (2010), *aff'd*, 420 Fed. App'x 973, 2011 WL 1810619 (Fed. Cir. 2011); *Fadelalla v. Sec'y of Health & Human Servs.*, No. 97-573V, 1999 WL 270423, at *6 (Fed. Cl. Spec. Mstr. Apr. 15, 1999), *aff'd*, 45 Fed. Cl. 196 (1999). As such, a treating physician's opinion on vaccine causation is only as strong as the underlying basis for the opinion. *See Perreira v. Sec'y of Health & Human Servs.*, 33 F.3d 1375, 1377 n.6 (Fed. Cir. 1994).

For example, if an evaluation of the record reveals that a physician received inaccurate or incomplete information about a petitioner's medical history, the weight given to a statement or opinion from such a physician could be reduced. *See, e.g., Fadelalla*, 1999 WL 270423, at *3, 5-6. In *Fadellala*, the petitioner's treating physician argued that there must be a relationship between the vaccine and petitioner's injury (GBS) "based upon other vaccine-related GBS cases he had seen" and "his conclusion that there was

an absence of any other cause." 45 Fed. Cl. at 200. The special master found this argument insufficient, and the court determined that that the special master did not act arbitrarily or capriciously in determining that the treating physician's testimony, as it related to his diagnosis of the petitioner's GBS, failed to "prove that more likely than not the vaccine caused her illness." *Id*.

In the present case, while Dr. Bruce pointed to apparently objective signs that the vaccine was administered in Petitioner's left arm, he was undoubtedly influenced by Petitioner's own report, as he references it throughout his treatment records.[21] However, the two contemporaneously-created vaccine records suggest that Petitioner may have been mistaken in his recollection, thus providing Dr. Bruce with inaccurate information on which to form his opinion on causation. Ex 6 at ¶ 30a. Furthermore, similar to the treating physician in *Fadelalla*, Dr. Bruce also relied on his experience treating "vaccine-related shoulder injuries," and there is no evidence that he considered any alternative cause for Petitioner's symptoms. *See* Exs 2, 6. In his brief, Petitioner also appears to argue that there could be no other cause for his left shoulder condition. ECF 50 at 17-18. But the absence of an alternative cause does not relieve a petitioner of his or her duty affirmatively to demonstrate by a preponderance of the evidence that a vaccine more likely than not caused the injury. *See* 42 U.S.C. § 300aa-13(a)(1).

As noted above, after Petitioner was provided with the opportunity to file his own expert report, he deferred, asserting that "to file additional expert testimony in this matter would only be duplicative and redundant," especially because of "the deference that should be given to a treating physician's opinion in these type of cases." Brief at 2 (citing *Capizzano v. Sec'y of Health & Human Servs.*, 440 F.3d 1317, 1326 (Fed. Cir. 2006). Petitioner further argues that Dr. Bruce's opinion should be afforded greater weight when compared with the opinion of Dr. Abrams, asserting that Dr. Bruce's "personal knowledge" of Petitioner "places him in a unique position to be able to evaluate if the condition for which he performed [surgery] was caused by a misplaced influenza injection and if a SIRVA diagnosis is appropriate in Petitioner's case."[22] ECF 45; ECF 50 at 14. He argues

---

[21] For example, Dr. Bruce's records from Petitioner's January 2017 reflect his conclusion that the findings shown on MRI "follows exactly . . . where [the vaccine] was injected by what [Petitioner] *reports to me*." Ex 2 at 8 (emphasis added).

[22] Petitioner also asserts that "Dr. Abrams does not state that he reviewed the affidavit authored by . . . Dr. Bruce." ECF 50 at 16. However, in the section labeled "Review of Material" in his report, Dr. Abrams indicates that he reviewed exhibits 1-8, which includes Dr. Bruce's affidavit, labeled as Exhibit 6. Ex A at 1. Dr. Abrams also specifically cites to Dr. Bruce's affidavit on multiple occasions throughout his report. Ex A at 4. This, combined with the fact that Dr. Bruce's affidavit primarily consists of a reiteration of the information contained in the medical records, clearly establishes that Dr. Abrams reviewed Dr. Bruce's affidavit. Incidentally, I also note that while Dr. Bruce acknowledges that he reviewed portions of the medical records from VOMC, he does not discuss the contemporaneous medical records from the clinic identifying the right deltoid/arm as the site of vaccination. *See* Ex 6.

15

that less weight should be given to Dr. Abrams' report because his opinion is based solely on a review of the record.[23] *Id*.

However, Dr. Abrams has raised reasonable concerns regarding the medical reliability of the "objective" findings relied upon by Dr. Bruce in formulating his opinion. Ex A. As summarized by Dr. Abrams, Dr. Bruce has provided no support for his theory that he could visualize a "needle track" or "the injection site . . . into the rotator cuff" on an MRI performed one month after vaccination. He also failed to explain how, even if he *were* able to locate the "needle track" and "where the bursa . . . had been injected" during arthroscopic surgery performed more than seven months after vaccination, he was able to differentiate the "damage" made by the flu vaccine compared to the four interim cortisone injections received by Petitioner, at least one of which (and the one Petitioner received most close in time to surgery) was administered in the bursa.[24] Ex 2 at 4.

Dr. Bruce's affidavit also includes statements that are inconsistent with the objective medical evidence. For example, while he asserts that rotator cuff tearing was shown on the MRI, his operative report reflects inflammatory changes but *no* tearing of the supraspinatus tendon and rotator cuff. Ex 2 at 1-2. Furthermore, while Dr. Bruce argues that excess fluid (caused by vaccination) in the subacromial space or bursa would indicate inflammation that could serve as a supposed cause of Petitioner's shoulder pain, he fails to reconcile this assertion with the fact that Petitioner's MRI *did not show* evidence of significant subacromial subdeltoid bursal fluid. Ex 2 at 20; Ex 6 at ¶ 24. Dr. Bruce has also neglected to provide a theory explaining how he was able to visualize "flu shot material" in Petitioner's shoulder during surgery more than seven months after vaccination. *Id*. at 2.

---

[23] Petitioner also argues that Dr. Bruce should be considered "better qualified" than Dr. Abrams because he has completed fellowships in both shoulder/sports medicine and pediatric orthopedic surgery and has been practicing longer than Dr. Abrams. ECF 50 at 15. While Dr. Bruce has been practicing longer than Dr. Abrams, Dr. Bruce has almost 15 years of experience, which is certainly not an insignificant amount. In making his argument that Dr. Bruce is "better qualified," Petitioner also fails to address Dr. Abrams' numerous publications, his role as an educator, and his presentations at surgical society conferences, as referenced above. Further, Dr. Bruce's fellowship in pediatric surgery is not particularly relevant, as Petitioner was an adult at both the time of his injury and his surgery. Ultimately, I find Dr. Abrams's report to have been more persuasive than what Dr. Bruce offers.

[24] Petitioner's second injection, on January 16, 2017, was administered in the "subacromial space in the joint." Ex 2 at 8. Soft tissues, such as the bicep tendon, rotator cuff, and bursa are located in the subacromial space. https://www.sports-health.com/glossary/subacromial-space (last visited September 29, 2021).

Finally, Petitioner asserts in his brief that by filing his affidavit, "Dr. Bruce is testifying that a healthcare provider (the VOMC nurse) employed by his own employer[25] . . . misplaced the influenza vaccine injection with the resulting injuries" and that "[s]uch testimony should be afforded a higher modicum of credibility." ECF 50 at 15. This argument stretches credulity. As emphasized by Petitioner himself, Dr. Bruce is an experienced orthopedic surgeon with 28 years of experience and his records do not reflect any concern that he was testifying "against" his employer, nor do they reference that Petitioner received his vaccination at a clinic affiliated with Erlanger Hospital. Therefore, for the reasons stated above, I find Dr. Abrams' opinion more persuasive and afford it greater weight.

### VII.    Conclusion

While Petitioner may honestly believe that he received the vaccine alleged as causal in his left arm, the record as it now stands preponderantly supports the opposite. I therefore find the vaccine at issue was more likely than not administered in Petitioner's right arm, consistent with the administration records.

### VIII.    Scheduling Order

On or before **Monday, November 8, 2021,** Petitioner is ordered to show cause as to why this case should not be dismissed. A failure to respond to this order will be treated as a failure to prosecute this claim. Respondent's response to any filing from Petitioner will be due fourteen days thereafter.

**IT IS SO ORDERED.**

s/Brian H. Corcoran
Brian H. Corcoran
Chief Special Master

---

[25] Petitioner's worksite medical clinic is affiliated with Baroness Erlanger Hospital. Ex 1 at 23. In his brief, Petitioner claims that CBJS is a "part of the Erlanger Health System," although he did not reference any specific evidence to support this assertion. ECF 50 at 2.